**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:17-cv-61941-CMA**

TODD M. BECKER,
individually and on behalf of all
others similarly situated,                                    **CLASS ACTION**

       Plaintiff,                                    **JURY TRIAL DEMANDED**

v.

QUINSTREET, INC., d/b/a
SCHOOLS.COM,
CAMPUSCORNER.COM, and
SEARCHSCHOOLSNETWORK.COM,
a foreign corporation,

       Defendant.
_____/

**FIRST AMENDED CLASS ACTION COMPLAINT[1]**

Plaintiff, Todd M. Becker, files his First Amended Class Action Complaint against

Defendant, QuinStreet, Inc., d/b/a schools.com, campuscorner.com, and

searchschoolsnetwork.com, and alleges as follows upon personal knowledge as to himself and his

own acts and experiences, and, as to all other matters, upon information and belief, including

investigation conducted by his attorneys.

**NATURE OF THE ACTION**

1.        This is a putative class action under the Telephone Consumer Protection Act, 47

U.S.C. § 227 et seq., ("TCPA"), arising from Defendant's knowing and willful violations of the TCPA.

---

[1] On December 4, 2017, Defendant filed a Motion to Dismiss Plaintiff's Complaint ("Motion to Dismiss") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  [ECF No. 19-1].  Pursuant to Fed. R. Civ. P. 15(a)(1), Plaintiff hereby amends his complaint as a matter of course thereby mooting Defendant's Motion to Dismiss.

2.          Defendant is a sophisticated publicly traded corporation that operates a vertical marketing and media online business.

3.          Despite its sophistication and having been sued for violating the TCPA on at least two (2) prior occasions, Defendant continues to engage in unsolicited telemarketing, with no regard for consumers' privacy rights.

4.          In fact, in its 2017 Form 10-K filing with the SEC, Defendant candidly admits that it operates call centers to solicit consumers: "we generate leads from which users provide a phone number, and a significant amount of revenue comes from calls made by our internal call centers as well as, in some cases, by third-party publishers' call centers."[2]

5.          At issue in this case is Defendant's acquisition of thousands of consumer telephone numbers – including Plaintiff's – from lead generation companies, including Rex Direct Net, Inc., ("Rex Direct"), to which Defendant sent unsolicited telemarketing text messages.

6.          The telephone numbers purchased by Defendant were deceptively obtained through websites owned and operated by Rex Direct and websites owned by other third-party lead generation companies.

7.          Lead generation companies, including Rex Direct, use these websites to harvest consumers' telephone numbers by falsely promising deals, savings, money, and prizes to consumers.

8.          For example, www.bestmoneysearch.com, one of a dozen websites operated by Rex Direct, promises consumers assistance with locating unclaimed funds from the government.[3]

9.          However, the website does nothing of the sort. After a consumer inputs her

---

[2] *See* 2017 Form 10-K located at https://investor.quinstreet.com/sec-filings?field_nir_sec_form_group_target_id%5B%5D=471&field_nir_sec_date_filed_value=#views-exposed-form-widget-sec-filings-table; (last accessed on December 14, 2017).

[3] *See* https://bestmoneysearch.com; (last accessed on December 14, 2017).

telephone number for the purpose of locating unclaimed funds, the website simply directs the consumer to government-operated sites that the consumer could have simply accessed on her own.

10.     Defendant knows that its third-party lead generation vendors, including Rex Direct, dupe consumers into inputting their telephone numbers.  In its 2017 Form 10-K, Defendant disclosed that it does not verify that the leads its purchases are compliant with the TCPA: "We also purchase a portion of our lead data from third-party publishers and cannot guarantee that these third-parties will comply with the [TCPA] regulations."[4]

11.     Nevertheless, Defendant purchased leads from Rex Direct and other third-party lead generators, and sent thousands of unsolicited text messages to unsuspecting consumers, including Plaintiff, who had no contact with Defendant and who did not provide express written consent to receive such texts from Defendant.

12.     Through this action, Plaintiff seeks injunctive relief to halt Defendant's unlawful conduct which has resulted in the invasion of privacy, harassment, aggravation, and disruption of the daily life of thousands of individuals.  Plaintiff also seeks statutory damages on behalf of himself and members of the class, and any other available legal or equitable remedies.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper under 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute. Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2) because Plaintiff alleges a national class, which will result in at least one class member belonging to a different state than that of Defendant.  Plaintiff seeks up to $1,500.00 (one-thousand-five-hundred dollars) in damages for each call in violation of the TCPA, which, when aggregated among a proposed class numbering in the tens

---

[4] *See* 2017 Form 10-K located at https://investor.quinstreet.com/sec-filings?field_nir_sec_form_group_target_id%5B%5D=471&field_nir_sec_date_filed_value=#views-exposed-form-widget-sec-filings-table; (last accessed on December 14, 2017).

of thousands, or more, exceeds the $5,000,000.00 (five-million dollars) threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA"). Therefore, both the elements of diversity jurisdiction and CAFA jurisdiction are present.

14.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction, and because Defendant provides and markets its services within this district thereby establishing sufficient contacts to subject it to personal jurisdiction.  Further, Defendant's tortious conduct against Plaintiff occurred within the State of Florida and, on information and belief, Defendant has sent the same text messages complained of by Plaintiff to other individuals within this judicial district, such that some of Defendant's acts in making such calls have occurred within this district, subjecting Defendant to jurisdiction in the State of Florida.

## PARTIES

15.     Plaintiff is a natural person who, at all times relevant to this action, was a resident of Broward County, Florida.

16.     Defendant is a foreign corporation headquartered in San Mateo County, California with its principal place of business located at 950 Tower Lane, 6th Floor, Foster City, California 94404.  Defendant directs, markets, and provides its business activities throughout the State of Florida.

## THE TCPA

17.     The TCPA prohibits: (1) any person from calling a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent.  47 U.S.C. § 227(b)(1)(A).

18.     The TCPA defines an "automatic telephone dialing system" ("ATDS") as

"equipment that has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

19.     The TCPA exists to prevent communications like the ones described within this complaint. "Voluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes—prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

20.     In an action under the TCPA, a plaintiff must only show that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014).

21.     The Federal Communications Commission ("FCC") is empowered to issue rules and regulations implementing the TCPA.  According to the FCC's findings, calls in violation of the TCPA are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).

22.     In 2012, the FCC issued an order tightening the restrictions for automated telemarketing calls, requiring "prior express **written** consent" for such calls to wireless numbers.  *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1838 ¶ 20 (Feb. 15, 2012)(emphasis supplied).

23.     To obtain express written consent for telemarketing calls, a defendant must

establish that it secured the plaintiff's signature in a form that gives the plaintiff a "'clear and conspicuous disclosure' of the consequences of providing the requested consent. . . . and having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1837 ¶ 18, 1838 ¶ 20, 1844 ¶ 33, 1857 ¶ 66, 1858 ¶ 71 (F.C.C. Feb. 15, 2012).

24.      The TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12).   In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the communication.  *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

25.      "Neither the TCPA nor its implementing regulations 'require an explicit mention of a good, product, or service' where the implication of an improper purpose is 'clear from the context.'" *Id*. (citing *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)).

26.      "'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services." *Golan*, 788 F.3d at 820 (citing 47 C.F.R. § 64.1200(a)(2)(iii); 47 C.F.R. § 64.1200(f)(12);  *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd at 14098 ¶ 141, 2003 WL 21517853, at *49).

27.      The FCC has explained that calls motivated in part by the intent to sell property, goods, or services are considered telemarketing under the TCPA.  *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶¶ 139-142 (2003). This is true whether call recipients are encouraged to purchase, rent, or invest in property, goods, or services during the call *or in the future.  Id*.

28.        In other words, offers "that are part of an overall marketing campaign to sell property, goods, or services constitute" telemarketing under the TCPA.  *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶ 136 (2003).

29.        If a call is not deemed telemarketing, a defendant must nevertheless demonstrate that it obtained the plaintiff's prior express consent.  *See In the Matter of Rules and Regulaions Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7991-92 (2015) (requiring express consent "for non-telemarketing and non-advertising calls").

30.        Further, the FCC has issued rulings and clarified that consumers are entitled to the same consent-based protections for text messages as they are for calls to wireless numbers. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("The FCC has determined that a text message falls within the meaning of 'to make any call' in 47 U.S.C. § 227(b)(1)(A)").

31.        As recently held by the United States Court of Appeals for the Ninth Circuit: "Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress has identified.'" *Van Patten v. Vertical Fitness Grp.*, No. 14-55980, 2017 U.S. App. LEXIS 1591, at *12 (9th Cir. May 4, 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (emphasis original)).

## FACTS

***Defendant Knowingly Buys Fraudulent Leads From Rex Direct And
Other Third-Party Lead Generators, Who Deceptively Harvest Telephone
Numbers Online Without Valid Express Written Consent***

32.        Defendant purchased thousands of leads (i.e. consumer contact information) from consumer lead generation companies like Rex Direct even though Defendant knew, or should have

known, that such companies do not comply with the TCPA.

33.    Defendant purchased thousands of leads from consumer lead generation companies like Rex Direct even though Defendant knew, or should have known, that such companies do not obtain valid express written consent from consumers.

34.    Defendant contracted with third-party lead generation companies to dupe consumers into inputting personal contact information into deceptive online web forms related to unclaimed money, shopping deals, coupons, and/or home services, which Defendant then used to aggressively send unsolicited text messages pitching something totally different i.e. their educational programs.

35.    Armed with such deceptively-obtained leads from Rex Direct and other lead generators, Defendant sent thousands of unsolicited text messages to consumers, including Plaintiff, that Defendant had no prior contact with whatsoever.

36.    Online lead generation companies thrive on a "bait and switch" methodology. Consumers search the Internet for specific topics such as shopping deals, coupons, or prizes, and online lead generation companies create dummy websites to capture their attention. Consumers submit their personal information to the lead generation companies, believing that they are taking steps to obtain information that they are actually searching for, but the lead generators simply sell this valuable, sometimes sensitive, private information to companies who want to sell their products and services to consumers in a certain demographic. Because online lead generation has been largely unregulated, fraud and abuse has run rampant. The Federal Trade Commission, the Consumer Financial Protection Bureau, consumer groups, and state regulators have all worked to end these deceptive practices and protect consumers.

37.    One such lead generation company, Rex Direct, operates by "hunting down

customized, multi-channeled solutions that take advantage of online and offline media for your customer acquisition campaigns."[5]

38.     On its website, Rex Direct flaunts its effectiveness in invading consumers' privacy rights, including the fact that it generates 2 million leads and places over 60,000 calls per month:[6]



39.     Defendant purchased consumer leads (names and telephone numbers) from Rex Direct, including Plaintiff's name and telephone number.

40.     Rex Direct operates almost a dozen websites as illustrated by the following Rex Direct promotional material:[7]

---

[5] *See* http://rexdirect.com/; (last accessed on December 14, 2017).
[6] *See id.*
[7] *See* https://d2ehj18o7gdun7.cloudfront.net/production/original/976.REXInfographic2014.pdf?139767805;
(last accessed on December 14, 2017).

**Real Experience. Real Sites.**
**OUR PROPERTIES**

**REX**
REX DIRECT NET

| Property | Category | Demographic |
|---|---|---|
| **Deal Soda**<br>www.dealsoda.com | Shopping, Deals | 70% Female; 25-22 |
| **Coupon Soda**<br>www.couponsoda.com | Coupons, Freebies | 85% Female; 25-65 |
| **Best Money Search**<br>www.bestmoneysearch.com | Freebies, Biz Opp | 55% Female; 28-55 |
| **Honest Insite**<br>www.honestinsite.com | Survey, Market Research | 55% Female; 28-65 |
| **Local Job Search USA**<br>www.localjobsearchusa.com | Jobs, Career | 55% Female; 28-55 |
| **Walk in Tub Advice**<br>www.walkintubadvice.com | Home, Health | 60% Female; 60-75 |
| **Tax-Refund**<br>www.tax-refund.com | Finance, Tax | 55% Male; 25-55 |
| **College Degree Connect**<br>www.collegedegreeconnect.com | Education | 55% Female; 25-55 |
| **BrringEDU.com**<br>www.brringedu.com | Education | 55% Female; 25-55 |
| **Best Home Savings**<br>www.besthomesavings.com | Home Improvement | 60% Male; 60-75 |
| **Quick Moving Quotes**<br>www.quickmovingquotes.com | Home Services | 55% Female; 25-45 |

41.     These websites promise consumers deals and savings related to various shopping categories (e.g. home improvement and retail coupons).

42.     In reality, however, the sites do not deliver on their promises to consumers, and are instead simply a tool used by Rex Direct to harvest consumer telephone numbers, which it then sells to companies like Defendant.

43.     For example, Rex Direct owns and operates www.bestmoneysearch.com, a website promising to assist consumers with locating unclaimed funds from government entities.

44.     Online searches reveal no evidence that the website has helped a single visitor claim unpaid money from any government entity, much less that "many of [bestmoneysearch.com's] visitors have found hundreds, even thousands of dollars they never knew they had," as the website claims.[8]

---

[8] *See* bestmoneysearch.com homepage, https://www.bestmoneysearch.com/ (last visited Dec. 7, 2017).

45.      In fact, the sole personal testimonial contained on the site's homepage is apparently from the site owner herself.  This testimonial reads: "'Seriously. It works! In minutes I found money not only for myself, but my family members as well. The whole process was online and got a check within weeks. Found money!' - Jennine, NJ."[9]

46.      Through www.bestmoneysearch.com, Rex Direct generates leads through a two-step process that tricks visitors into believing that the government owes them money.

47.      First, on the website's landing page, a consumer is prompted to enter her name and zip code to "FIND YOUR UNCLAIMED MONEY!":[10]



48.      Regardless of the information inputted into the name and zip code fields, a consumer will always be taken to a second page (depicted on the following page) that states in large

---

[9] *Id.*  Several domain registration and site ownership directories list a Jennine Rexon of Cherry Hill, NJ as the owner of bestmoneysearch.com. *See, e.g.,* WebDex Analytics, https://www.webdex.com/bestmoneysearch.com.html (last visited Dec. 7, 2017); HostDir, http://bestmoneysearch.com.hostdir.org/ (last visited Dec. 7, 2017). Ms. Rexon is the founder and president of the marketing company Rex Direct Inc. Net (*see* http://rexdirect.com/, identifying Jennine T. Rexon as President), which lists alongside bestmoneysearch.com other of its "properties," including localjobsearchusa.com (a "jobs and career" site), honestinsite.com (a "survey and market research" site), makingamatch.com (a "dating" website), getpaincream.com (a "health" site), and taxrefund.co (a "finance" and "tax" site).  *See* https://www.slideshare.net/JennineRexon/rexinfographic2015 (last visited Dec. 11 2017).
[10] *See* www.bestmoneysearch.com; (last accessed on December 14, 2017).

bold print: "Great News [first name]! We may have found Unclaimed Funds in [city], [state] for [first name] [last name]. Enter your information to gain access," implying that all the fields below are intended to collect information necessary for "unlocking" the unclaimed funds.[11]



49.       Depending on how the consumer answers the four question fields, the website will pre-populate boilerplate language presented to the consumer in miniscule font, which lists several entities (e.g. College Degree Connect, Future Careers, Accredited Debt Relief, etc.) having nothing to do with locating unclaimed funds as depicted in the following screenshot:

[11] *See id.*



50.     Next, after the consumer has inputted her telephone number and address to "gain access" to allegedly "found Unclaimed Funds" for the consumer, the website directs the consumer through a series of questions that again are unrelated to claiming such funds:[12]

---

[12] The following screenshots are in the order presented to the consumer on the website.  The numbering on the top of each screenshot is accurately depicted, and the errors in numbering shown are original to the website.













51.     Lastly, the consumer is instructed to visit her state's agency responsible for processing unclaimed funds (e.g. the Florida Department of Financial Services) as depicted by the following screenshot:



Finding Your Unclaimed Funds in FL

The majority of unclaimed property is lost as a result of a change of address, a name change due to a marriage of divorce or death of the owner and the estate was unaware of the money. When this happens the money is then turned over to the state.

All it takes is for you to overlook the cash you have coming from one of the above transactions and your money will be turned over to the states unclaimed property division.

The most common way this happens is that you move and the company you had dealings with tried to contact you at your old address and could not locate your new address.

To find your money visit the state's unclaimed property searchable website. You can find the link below. Once you are at the state website, enter the information they ask for (ex: name & SS#) and you will know if you have any unclaimed funds due to you instantaneously.

To collect your unclaimed funds submit online form or mail in paperwork. Typically a check will come in approximately twelve weeks.

Tip: Find money for friends and family! It's fun to help them find their missing money too.

**Claim Your Money**

**Florida**
Florida Department of Financial Services
Unclaimed Property Bureau
200 E. Gaines Street
Tallahassee, FL 32399-0358
Phone: 850-413-5555
Toll Free: 888-258-2253
Fax: 850-413-3017

52.     In all, the various websites operated by Rex Direct are a bait-and-switch scam aimed at obtaining visitors' personal information without delivering anything in return, aside from unwanted, aggravating, and disruptive text messages from third-party marketers.

53.     This "bait and switch" tactic used by online lead generation companies like Rex Direct, and exploited by Defendant, preys on consumers by purporting to offer things that they want and need—information on unclaimed funds, saving money, housing services—when they are actually designed to capture users' phone numbers so they can be barraged with text messages by for-profit college recruiters.

54.     Therefore, any consent purportedly obtained by these lead generation company websites is invalid, and cannot be used to circumvent the TCPA's very clear requirements regarding

telemarketing phone calls and text messages.

### *Facts Specific to Plaintiff Todd Becker*

55.        On or about August 22, 2017, Plaintiff visited www.bestmoneysearch.com for the sole purpose of locating unclaimed funds.

56.        Plaintiff inputted his name and telephone number for the purpose of locating unclaimed funds, and only for that purpose.

57.        Plaintiff did not receive any unclaimed funds as a result of having visited www.bestmoneysearch.com.

58.        The following day, on August 23, 2017 at 10:48 a.m., and then on August 24, 2017 at 11:58 a.m., and August 25, 2017 at 1:07 p.m., Defendant, using an automated text-messaging platform, caused the following text messages to be transmitted to Plaintiff's cellular telephone number ending in 8676 (the "8676 Number"):



(646) 832-2422

Text Message
Wed, Aug 23, 10:48 AM

Todd, become a leader in business with the right program: clck.co/s/vuimez or call us at (844)645-3323. No more SMS from Schools.com? Reply stop

Thu, Aug 24, 11:58 AM

Invest in your future with these schools we found for you: clck.co/s/

for you: clck.co/s/
vwksDK or get live help
at (844)645-3323. No
more SMS from
Schools.com? Reply
stop

Fri, Aug 25, 1:07 PM

Ready to serve &
protect your
community? Find
criminal justice
programs: clck.co/s/
vykzB5 No more SMS
from Schools.com?
Reply stop

59.     Prior to receiving these text messages, Plaintiff had no prior contact whatsoever

with Defendant.

60.     The above text messages were transmitted to Plaintiff's cellular telephone, and

within the time frame relevant to this action.

61.     Defendant's text messages constitute telemarketing because they encouraged the

future purchase or investment in property, goods, or services.

62.     The telephone number (646-832-2422) from which the text messages originated is

a spoofed[13] number operated by or on behalf of Defendant.

63.     The telephone number (844-645-3323) identified in the August 23rd and August

24th text messages is owned and operated by Defendant, and answered by a prerecorded message that

states: "Thank you for calling schools.com provided QuinStreet . . ."

---

[13] "Spoofing occurs when a caller deliberately falsifies the information transmitted to your caller ID display to
disguise their identity."  https://www.fcc.gov/consumers/guides/spoofing-and-caller-id.

64.      The "clck.co/s/vuimez" and "clck.co/s/vykzB5" links contained in the August 23rd and August 25th text messages are links to www.campuscorner.com, a website "owned and operated by QuinStreet, Inc…."[14]

65.      The "clck.co/s/vwksDK" link contained in the August 24th text message is link to www. searchschoolsnetwork.com, a website owned and operated by Defendant.

66.      The "schools.com" link contained in all three text messages is a link to www.schools.com, a website "owned and operated by QuinStreet, Inc. . . ."[15]

67.      Plaintiff received the subject text messages within this judicial district and, therefore, Defendant's violation of the TCPA occurred within this district. Upon information and belief, Defendant caused other text messages to be sent to individuals residing within this judicial district.

68.      At no point in time did Plaintiff provide Defendant with his express written consent to be contacted using an ATDS.

69.      Plaintiff is the subscriber and sole user of the 8676 Number, and is financially responsible for phone service to the 8676 Number.

70.      The impersonal and generic nature of Defendant's text message demonstrates that Defendant utilized an ATDS in transmitting the message. *See Jenkins v. LL Atlanta, LLC*, No. 1:14-cv-2791-WSD, 2016 U.S. Dist. LEXIS 30051, at *11 (N.D. Ga. Mar. 9, 2016) ("These assertions, combined with the generic, impersonal nature of the text message advertisements and the use of a short code, support an inference that the text messages were sent using an ATDS.") (citing *Legg v. Voice Media Grp., Inc.*, 20 F. Supp. 3d 1370, 1354 (S.D. Fla. 2014) (plaintiff alleged facts sufficient to infer text messages were sent using ATDS; use of a short code and volume of mass messaging alleged would

---

[14] *See* http://www.campuscorner.com/about-us.htm.

[15] *See* http://www.schools.com/about.

be impractical without use of an ATDS); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1171 (N.D. Cal. 2010) (finding it "plausible" that defendants used an ATDS where messages were advertisements written in an impersonal manner and sent from short code); *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1130; *Robbins v. Coca-Cola Co.*, No. 13-CV-132-IEG NLS, 2013 U.S. Dist. LEXIS 72725, 2013 WL 2252646, at *3 (S.D. Cal. May 22, 2013) (observing that mass messaging would be impracticable without use of an ATDS)).

71.　　　In fact, in a Form 10-Q filed with the SEC, Defendant candidly admits that the "calls made by our call centers and text messages to mobile phones" are regulated by the TCPA.[16] In other words, Defendant admits that its call centers use ATDS to send text messages.

72.　　　Specifically, upon information and belief, Defendant utilized a combination of hardware and software systems to send the text message at issue in this case.  The systems utilized by Defendant have the current capacity or present ability to generate or store random or sequential numbers or to dial sequentially or randomly at the time the call is made, and to dial such numbers, *en masse*, in an automated fashion without human intervention.

73.　　　Defendant's unsolicited text messages caused Plaintiff actual harm, including invasion of his privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion. Defendant's text messages also inconvenienced Plaintiff and caused disruption to his daily life.  *See Patriotic Veterans, Inc. v. Zoeller*, No. 16-2059, 2017 WL 25482, at *2 (7th Cir. Jan. 3, 2017) ("Every call uses some of the phone owner's time and mental energy, both of which are precious.").  Defendant received the subject text messages while he was at work, causing him to stop his work activities to check his phone.

---

[16] *See* Nov. 5, 2012 Form 10-Q available at https://investor.quinstreet.com/sec-filings?field_nir_sec_form_group_target_id%5B0%5D=496&field_nir_sec_date_filed_value=&0=496&field_nir_sec_cik_value=&items_per_page=10&page=1; (last accessed on December 14, 2017).

## CLASS ALLEGATIONS

### PROPOSED CLASS

74.      Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and all others similarly situated.

75.      Plaintiff brings this case on behalf of a Class defined as follows:

> **All persons within the United States who, within the four years prior to the filing of this Complaint, were sent a text message made through the use of any automatic telephone dialing system or an artificial or prerecorded voice, from Defendant or anyone on Defendant's behalf, to said person's cellular telephone number, without emergency purpose and without the recipient's prior express consent.**

76.      Defendant and its employees or agents are excluded from the Class. Plaintiff does not know the number of members in the Class, but believes the Class members number in the several thousands, if not more.

### NUMEROSITY

77.      Upon information and belief, Defendant has placed automated and/or prerecorded calls to cellular telephone numbers belonging to thousands of consumers throughout the United States without their prior express consent. The members of the Class, therefore, are believed to be so numerous that joinder of all members is impracticable.

78.      The exact number and identities of the Class members are unknown at this time and can only be ascertained through discovery. Identification of the Class members is a matter capable of ministerial determination from Defendant's call records.

### COMMON QUESTIONS OF LAW AND FACT

79.      There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class. Among the questions

of law and fact common to the Class are:

    (1) Whether Defendant made non-emergency calls to Plaintiff's and Class members' cellular telephones using an ATDS;

    (2) Whether Defendant can meet its burden of showing that it obtained prior express written consent to make such calls;

    (3) Whether Defendant's conduct was knowing and willful;

    (4) Whether Defendant is liable for damages, and the amount of such damages; and

    (5) Whether Defendant should be enjoined from such conduct in the future.

80.    The common questions in this case are capable of having common answers. If Plaintiff's claim that Defendant routinely transmits text messages to telephone numbers assigned to cellular telephone services is accurate, Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

### TYPICALITY

81.    Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

### PROTECTING THE INTERESTS OF THE CLASS MEMBERS

82.    Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class, and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

### PROCEEDING VIA CLASS ACTION IS SUPERIOR AND ADVISABLE

83.    A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the

Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

84.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another may not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

### COUNT I
### Violations of the TCPA, 47 U.S.C. § 227(b)
### (On Behalf of Plaintiff and the Class)

85.     Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

86.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

87.     "Automatic telephone dialing system" refers to any equipment that has the "capacity to dial numbers without human intervention." *See, e.g., Hicks v. Client Servs., Inc.*, No. 07-61822, 2009 WL 2365637, at *4 (S.D. Fla. June 9, 2009) (citing FCC, In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991: Request of ACA International for Clarification and Declaratory Ruling, 07–232, ¶ 12, n.23 (2007)).

88.     Defendant – or third parties directed by Defendant – used equipment having the capacity to dial numbers without human intervention to make non-emergency telephone calls to the cellular telephones of Plaintiff and the other members of the Class defined below.

89.     These calls were made without regard to whether Defendant had first obtained express permission from the called party to make such calls. In fact, Defendant did not have prior express consent to call the cell phones of Plaintiff and the other members of the putative Class when its calls were made.

90.     Defendant has, therefore, violated § 227(b)(1)(A)(iii) of the TCPA by using an automatic telephone dialing system to make non-emergency telephone calls to the cell phones of Plaintiff and the other members of the putative Class without their prior express consent.

91.     Defendant knew that it did not have prior express consent to make these calls, and knew or should have known that it was using equipment that at constituted an automatic telephone dialing system. The violations were therefore willful or knowing.

92.     As a result of Defendant's conduct and pursuant to § 227(b)(3) of the TCPA, Plaintiff and the other members of the putative Class were harmed and are each entitled to a minimum of $500.00 in damages for each violation. Plaintiff and the class are also entitled to an injunction against future calls. *Id*.

93.     Because Defendant knew or should have known that Plaintiff and the other members of the putative Class had not given prior express consent to receive its autodialed calls to their cellular telephones the Court should treble the amount of statutory damages available to Plaintiff and the other members of the putative Class pursuant to § 227(b)(3) of the TCPA.

**WHEREFORE**, Plaintiff, Todd M. Becker, on behalf of himself and the other members of the Class, pray for the following relief:

a.  A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b.  An injunction prohibiting Defendant from using an automatic telephone dialing system to text message telephone numbers assigned to cellular telephones without the prior express permission of the called party;

c.  An award of actual and statutory damages; and

d.  Such further and other relief the Court deems reasonable and just.

**COUNT II**
**Knowing and/or Willful Violation of the TCPA, 47 U.S.C. § 227(b)**
**(On Behalf of Plaintiffs and the Class)**

94.    Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

95.    At all times relevant, Defendant knew or should have known that its conduct as alleged herein violated the TCPA.

96.    In fact, on at least two (2) prior occasions, Defendant has been sued for violating the TCPA.

97.    Defendant knew that it did not have prior express consent to send these text messages, and knew or should have known that its conduct was a violation of the TCPA.

98.    Because Defendant knew or should have known that Plaintiff and Class Members had not given prior express consent to receive its autodialed calls, the Court should treble the amount of statutory damages available to Plaintiff and the other members of the putative Class pursuant to § 227(b)(3) of the TCPA.

99.     As a result of Defendant's violations, Plaintiff and the Class Members are entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

**WHEREFORE**, Plaintiff, Todd M. Becker, on behalf of himself and the other members of the Class, pray for the following relief:

a.  A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b.  An injunction prohibiting Defendant from using an automatic telephone dialing system to call and text message telephone numbers assigned to cellular telephones without the prior express permission of the called party;

c.  An award of actual and statutory damages; and

d.  Such further and other relief the Court deems reasonable and just.

## <u>JURY DEMAND</u>

Plaintiff and Class Members hereby demand a trial by jury.

Date: December 15, 2017

Respectfully submitted,

| **HIRALDO P.A.** | **TYCKO & ZAVAREEI LLP** |
|---|---|
| | Andrea Gold |
| /s/ Manuel S. Hiraldo | *Pro Hac Vice* |
| Manuel S. Hiraldo | Andrew J. Silver |
| Florida Bar No. 030380 | *Pro Hac Vice* |
| 401 E. Las Olas Boulevard | 1828 L Street NW, Suite 1000 |
| Suite 1400 | Washington, DC 20036 |
| Ft. Lauderdale, Florida 33301 | Tel: 202-973-0900 |
| Email: mhiraldo@hiraldolaw.com | Fax: 202-973-0950 |
| Telephone: 954.400.4713 | *agold@tzlegal.com* |
| | *asilver@tzlegal.com* |
| *Counsel for Plaintiff* | |
| | *Counsel for Plaintiff* |
| **SHAMIS & GENTILE, P.A.** | |
| Andrew J. Shamis | |
| Florida Bar No. 101754 | |
| ashamis@shamisgentile.com | |
| 14 NE 1st Avenue, Suite 400 | |
| Miami, Florida  33132 | |
| (t) (305) 479-2299 | |
| (f) (786) 623-0915 | |
| | |
| *Counsel for Plaintiff* | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 15, 2017, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served

this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: *<u>/s/ Manuel S. Hiraldo</u>*
Manuel S. Hiraldo, Esq.
HIRALDO P.A.
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Florida Bar No. 030380
mhiraldo@hiraldolaw.com
Telephone: 954.400.4713